

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAGISTRATE JUDGE KIM

JUDGE PALLMEYER

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | Case No. | **14 CR 732** |
| vs. | ) | | |
| | ) | | |
| JANET GUERRERO and | ) | Violations: | Title 18, United States Code, Section 1349 |
| SHERWIN CUBELO | ) | | |
| | ) | | |

12-17-2014
FILED
DEC 17 2014
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## COUNT ONE

The SPECIAL SEPTEMBER 2014 GRAND JURY charges:

1.   At times material to this Indictment:

### The Medicare Program

a.   The Medicare program was a federal health care program providing benefits to persons who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services, a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

b.   Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

c.   The Medicare program included coverage under two primary components, hospital insurance ("Part A") and medical insurance ("Part B"). Part A of the Medicare program covered the cost of home health care services such as skilled nursing services and physical therapy.

d.   Palmetto GBA and National Government Services were the CMS-contracted carriers for Medicare Part A in the state of Illinois. TrustSolutions, LLC and Cahaba

Safeguard Administrators, LLC were the Program Safeguard Contractors for Medicare Part A in the state of Illinois.

   e. By becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers were given and provided with online access to Medicare manuals and service bulletins describing proper billing procedures and billing rules and regulations.

   f. Upon certification, the medical provider, whether a clinic or an individual, was assigned a provider identification number for billing purposes (referred to as a PIN). When the medical provider rendered a service, the provider submitted a claim for reimbursement to the Medicare contractor/carrier that included the PIN assigned to that medical provider.

   g. Medicare Part A regulations required health care providers enrolled with Medicare to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting the actual treatment of the patients to whom services were provided and on whose behalf claims for payment were submitted. These records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of payments made to the health care provider under the Part A program.

h. Providers could submit claims to Medicare only for services they rendered, and providers were required to maintain patient records to verify that the services were provided as described in claims for payment submitted to Medicare.

i. To receive reimbursement for a covered service from Medicare, a provider was required to submit a claim, either electronically or using a form, containing the required information appropriately identifying the provider, patient, and services rendered.

j. A home health agency was an entity that provided health care services to Medicare beneficiaries in their homes. Home health care services included but were not limited to skilled nursing services and physical therapy. Medicare covered home health care services when beneficiaries needed skilled care and were homebound.

k. For a beneficiary to be eligible to receive home health care services covered by Medicare, a physician was required to certify that the patient needed skilled care and was homebound.

### Defendants and The Companies

l. Donnarich Home Health Care, Inc. was a home health agency that purported to provide home health care services to patients in their homes. Donnarich was located in Lincolnwood, Illinois.

m. Josdan Home Health Care, Inc. was a home health agency that purported to provide home health services to patients in their homes. Josdan was located in Lincolnwood, Illinois.

n. Pathways Home Health Services, LLC was a home health agency that purported to provide home health services to patients in their homes. Pathways was located in Lincolnwood, Illinois.

   o. All In One Marketing Agency Inc. was a corporation registered in the state of Illinois and located in Hammond, Indiana.

   p. JANET GUERRERO, a resident of Cook County, Illinois, was the Office Manager of Josdan and was listed as owner of Pathways.

   q. SHERWIN CUBELO, a resident of Lake County, Indiana, was the President of All In One Marketing and recruited Medicare beneficiaries for Donnarich, Josdan, and Pathways.

   2. From in or around January 2008 and continuing through in or around August 2012, at Cook County, in the Northern District of Illinois, and elsewhere,

JANET GUERRERO and
SHERWIN CUBELO,

defendants herein, did conspire with each other and others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, knowingly and willfully to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, which conspiracy is further described below.

**Purpose of the Conspiracy**

   3. It was a purpose of the conspiracy for defendants JANET GUERRERO and SHERWIN CUBELO to unlawfully enrich themselves and others by, among other things,

submitting or causing the submission of false and fraudulent claims to Medicare, and diverting proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators.

### Manner and Means

4. It was part of the conspiracy that SHERWIN CUBELO supplied Donnarich, Josdan, and Pathways with the names and contact information of Medicare beneficiaries who did not qualify for home health care services because they were not homebound and did not need skilled care.

5. It was further part of the conspiracy that SHERWIN CUBELO received bribe and kickback payments in exchange for supplying Medicare beneficiaries to Donnarich, Josdan, and Pathways.

6. It was further part of the conspiracy that JANET GUERRERO and others kept track of the beneficiaries referred to Donnarich and Josdan by CUBELO, and calculated the bribe and kickback payments he was owed in exchange for those referrals.

7. It was further part of the conspiracy that JANET GUERRERO and others arranged home health services for the beneficiaries referred by SHERWIN CUBELO and others, knowing that such beneficiaries did not need home health care and were not qualified for home health care services because they were not homebound.

8. It was further part of the conspiracy that JANET GUERRERO and others communicated with SHERWIN CUBELO about the beneficiaries he referred to Donnarich and Josdan when those beneficiaries refused services, so that CUBELO could contact the beneficiaries and persuade them to enroll in home health care.

9. It was further part of the conspiracy that at times, SHERWIN CUBELO paid the beneficiaries he referred to Donnarich, Josdan, and Pathways to induce them to agree to accept home health care services.

10. It was further part of the conspiracy that JANET GUERRERO and others enrolled Medicare beneficiaries in home health care at Donnarich and Josdan even though they were aware that the beneficiaries did not need or qualify for the care, causing Medicare to pay Donnarich and Josdan for home health care services that were not medically necessary and were not provided.

11. It was further part of the conspiracy that JANET GUERRERO and others ignored the findings of physicians who concluded that beneficiaries were not qualified for home health care, and obtained other physicians to certify the beneficiaries as eligible to receive home health care.

12. It was further part of the conspiracy that JANET GUERRERO, SHERWIN CUBELO, and others caused Donnarich, Josdan, and Pathways to submit claims to Medicare for services that were not medically necessary, and caused Medicare to make more than $49 million in payments for home health care services.

13. It was further part of the conspiracy that JANET GUERRERO and others would transfer and disburse, and cause the transfer and disbursement of, funds from the various bank accounts of Donnarich, Josdan, and Pathways, and from secondary bank accounts that were funded by Donnarich, Josdan, and Pathways, to themselves and others.

14. It was further part of the conspiracy that the defendants and others misrepresented, concealed, hid, and caused to be misrepresented, concealed, and hidden, the purpose of the conspiracy and acts done in furtherance of the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATIONS

The SPECIAL SEPTEMBER 2014 GRAND JURY further alleges:

1. The allegations contained in Count One of this Indictment are incorporated here for the purpose of alleging forfeitures pursuant to the provisions of Title 18, United States Code, Section 982.

2. Upon conviction of a violation of Title 18, United States Code, Section 1349, as alleged in Count One of this Indictment, the defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

3. The property to be forfeited includes, but is not limited to, a money judgment in the amount of at least $49,646,906.04.

4. If any of the property described above, as a result of any act or omission of the defendants:

    i. cannot be located upon the exercise of due diligence;

    ii. has been transferred or sold to, or deposited with, a third party;

    iii. has been placed beyond the jurisdiction of the Court;

    iv. has been substantially diminished in value; or

    v. has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek to forfeit any other property of the defendants up to the value of the forfeitable property described above.

A TRUE BILL:

_____
FOREPERSON


_____
UNITED STATES ATTORNEY



_____
UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION
DEPUTY CHIEF