**FILED**

JUL 1 8 2016

JUDGE REBECCA R. PALLMEYER
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

AVELINA FIEL

No. 14 CR 732

Judge Rebecca R. Pallmeyer

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, ZACHARY T. FARDON, and defendant AVELINA FIEL, and her attorney, STANDISH E. WILLIS, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The parties to this Agreement have agreed upon the following:

## Charges in This Case

2.     The third superseding indictment in this case charges defendant with conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349.

3.     Defendant has read the charges against her contained in the third superseding indictment, and those charges have been fully explained to her by her attorney.

4.     Defendant fully understands the nature and elements of the crimes with which she has been charged.

**Charge to Which Defendant Is Pleading Guilty**

5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following count of the third superseding indictment: Count 1, which charges defendant with conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349.

**Factual Basis**

6.     Defendant will plead guilty because she is in fact guilty of the charge contained in Count 1 of the third superseding indictment. In pleading guilty, defendant admits the following facts and that those facts establish her guilt beyond a reasonable doubt:

From in or around August 2012 and continuing through in or around March 2014, at Cook County, in the Northern District of Illinois, AVELINA FIEL did conspire with Richard Tinimbang, Administrator B, Sharon Gulla, Isabelita Sabejon, Nurse A, and others known and unknown, to violate Title 18, United States Code, Section 1347, that is, knowingly and willfully to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

## The Home Health Care Companies

Pathways Home Health Services LLC was a home health care company located in Lincolnwood, Illinois. Pathways purported to provide home health care services to beneficiaries insured by Medicare.

Medicare covered home health care services when beneficiaries were "homebound," or confined to the home. Home health care services were provided in 60-day periods of care, or "episodes." Medicare required a physician to certify each beneficiary as homebound in connection with every episode of care, and required the physician to assess the patient's homebound status during a face-to-face visit.

Medicare also required a registered nurse to complete a comprehensive health assessment, known as an OASIS assessment, for each beneficiary at the start of every episode of home health care. As part of the OASIS assessment, Medicare required the registered nurse to independently assess whether the beneficiary was homebound. The OASIS information was transmitted to Medicare, and Medicare used the information to determine how much to pay the home health care company for each episode of care. The sicker the patient appeared to be according to the OASIS assessment, the more Medicare paid for the episode of care.

The following individuals had the following roles during relevant periods:

- Josephine Tinimbang was an owner of Josdan and Pathways.
- Richard Tinimbang also appeared to be an owner of Pathways. He hired employees, assigned their duties, and exercised decision-making authority directly and through Administrator B.

3

- Administrator B was the day-to-day manager at Pathways and held the title of Administrator. She consulted with Richard Tinimbang before making decisions.

- Sharon Gulla was the Assistant Director of Nursing and a Quality Assurance Supervisor at Pathways.

- Nurse A was an admissions nurse at Pathways.

### The Conspiracy to Defraud

The defendant was a registered nurse licensed to practice nursing in the State of Illinois. In approximately January 2012, defendant was interviewed by Richard Tinimbang and started working as a quality assurance employee at Pathways. Defendant quit the position just days after being hired, after noticing that many of the patients' files did not contain the physician orders, plans of care, and face-to-face visit documentation required by Medicare. After being contacted by Josephine Tinimbang, defendant agreed to return to Pathways as its director of nursing. Defendant was paid approximately $100,000 per year in that role, which she held until Pathways closed in March 2014.

Defendant understood the patients enrolled in home health care at Pathways were insured by Medicare, and Medicare required the patients to be homebound and have a need for skilled care. Yet defendant knew that most of the patients enrolled at Pathways were not homebound. Defendant knew this because (among other reasons) most of the patients came from "community referral sources," not doctors or hospitals. In the early months of defendant's employment at Pathways, the company obtained patients from a community referral source known as "Kobe."

Defendant received phone calls from patients who asked for money they had been promised by Kobe in exchange for enrolling, and defendant repeatedly reported such phone calls to Administrator B. Administrator B told defendant she would discuss the phone calls with Richard Tinimbang, but the company continued to accept patients that had been supplied by Kobe.

In the summer or fall of 2012, Kobe took most of his patients away from Pathways. Pathways subsequently obtained most of its patients from a community referral source referred to here as Source A. According to defendant, Pathways obtained approximately 80-85% of its patients from community sources, and the patients from such sources typically were not homebound.

In order to make it appear that patients were homebound when they were not, defendant instructed at least one nurse, Nurse A, to falsify OASIS forms. Defendant told Nurse A to make it appear that patients had more difficulty completing daily tasks like bathing than they in fact had, and told Nurse A to state on the forms that all individuals over the age of 65 were incontinent.

On occasion, the doctors who evaluated patients for enrollment at Pathways refused to certify them for home health care because they were not homebound. Defendant instructed the Quality Assurance supervisors not to document physicians' refusals to certify a patient as homebound in the patient's medical file. And, when such patients were sent to a second doctor in an attempt to obtain the necessary homebound certification, defendant concealed from the second physician

the fact that a first physician had already concluded the patient was not homebound.

Throughout defendant's employment at Pathways, the company and its employees used a practice that was referred to as patient "recycling." Under this practice, patients who were not really homebound and/or did not really need home health care were enrolled for up to six consecutive months of care, then discharged for a period of approximately three to six weeks, then re-enrolled for additional unnecessary care. When patients were really sick and needed care – or when patients refused home health care and could not be persuaded to accept it – such patients were not subjected to pre-scheduled discharges or re-enrollments.

The Quality Assurance supervisors were responsible for ensuring that the patients they oversaw were re-certified for additional care and discharged from care according to the recycling timeline. On one occasion, Administrator B called defendant into a meeting with the Quality Assurance supervisors, including Sharon Gulla, and Administrator B emphasized the importance of following the practice of enrolling patients for four to six months, discharging them for twenty-one days, then re-enrolling them for more home health care. To facilitate the recycling Administrator B required, defendant instructed Nurse A to falsely calibrate patients' OASIS forms so that the patients appeared to need care at the beginning of the six-month period and appeared to have recovered somewhat by the end of the period. In fact, the patients' conditions did not change. According to defendant, approximately 80% of Pathways' patients were subjected to recycling.

6

After working at Pathways for a short time, Nurse A approached defendant and complained about the non-homebound nature of the patients he was assigned to assess and enroll in home health care. Nurse A noted that the practices at Pathways were illegal, and defendant agreed. In response to Nurse A's complaints and warnings of illegality, the defendant and Nurse A met with Richard Tinimbang and Administrator B. Nurse A stated during the meeting that the patients at Pathways were not homebound and did not need skilled care. Nurse A asked Richard Tinimbang and Administrator B why Pathways could not get "better" – that is, qualified – patients. Neither Richard Tinimbang nor Administrator B expressed surprise, or denied Nurse A's assertions that the patients were not qualified for care. Richard Tinimbang said they would look into things, and the meeting ended.

However, in a subsequent meeting at Pathways, Richard Tinimbang informed defendant, Nurse A, and other admissions nurses that they needed to enroll more patients at Pathways or Richard Tinimbang would be required to lay people off. Nothing changed with regard to the source or quality of the company's patients. Defendant understood Richard Tinimbang's comments to mean that she and the other nurses should continue admitting patients who were not homebound and did not need skilled care, regardless of the warnings raised by Nurse A.

In sum, the defendant, Richard Tinimbang, Administrator B, Sharon Gulla, Isabelita Sabejon, Nurse A, and others agreed that Pathways would submit, and in fact caused Pathways to submit, fraudulent claims to Medicare for home health care

7

services that beneficiaries did not qualify for or need. From approximately October 2012 to March 2014, the defendant, the above-named individuals, and others caused Medicare to pay Pathways at least $1.5 million for fraudulent home health care claims.

7. The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

### Maximum Statutory Penalties

8. Defendant understands that the charge to which she is pleading guilty carries the following statutory penalties:

a. A maximum sentence of 10 years' imprisonment. This offense also carries a maximum fine of $250,000. Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

b. Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

c. In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which she has pled guilty, in addition to any other penalty or restitution imposed.

### Sentencing Guidelines Calculations

9. Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that

the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

10.    For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.    **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2015 Guidelines Manual.

b.    **Offense Level Calculations**.

i.    The base offense level is 6, pursuant to Guideline § 2B1.1(a)(2).

ii.    The loss amount to Medicare is greater than $1,500,000 but not more than $3,500,000.  Therefore, pursuant to Guideline § 2B1.1(b)(1)(I), the base offense level is increased by 16 levels.

iii.    The offense of conviction is a Federal health care offense involving a Government health care program and the loss amount to Medicare is more than $1 million.  Therefore, the offense level is increased by 2 levels under Guideline § 2B1.1(b)(7).

iv.    The defendant was a manager and the criminal activity involved more than five participants.  The offense level is therefore increased by 3 levels pursuant to Guideline § 3B1.1.

      v.      The defendant, a supervisory nurse, occupied a position of trust with the Medicare program and abused that trust by instructing subordinates to falsify OASIS forms. The offense level is therefore increased by 2 levels under Guideline § 3B1.3.

      vi.      Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for her criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for her actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to her ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

      vii.      In accord with Guideline § 3E1.1(b), defendant has timely notified the government of her intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

      c.      **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts

now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

      d.    **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the anticipated offense level is 26, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 63 to 78 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

      e.    Defendant and her attorney and the government acknowledge that the above guidelines calculations are preliminary in nature and based on facts known to the parties as of the time of this Agreement. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guidelines calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw her plea on the basis of the Court's rejection of these calculations.

      f.    Errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such

11

corrections, and defendant shall not have a right to withdraw her plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

## Cooperation

11.    Defendant agrees she will fully and truthfully cooperate in any matter in which she is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding. Defendant agrees to the postponement of her sentencing until after the conclusion of her cooperation.

## Agreements Relating to Sentencing

12.    At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this Agreement, then the government shall move the Court, pursuant to Guideline § 5K1.1, to depart downward from the low end of the applicable guideline range, and shall recommend a sentence that includes a term of imprisonment in the custody of the Bureau of Prisons of 60 percent of the low end of the applicable guideline range. Defendant shall be free to recommend any sentence. Defendant understands that the decision to depart from the applicable guideline range rests solely with the Court.

13. If the government does not move the Court, pursuant to Guideline § 5K1.1, to depart from the applicable guideline range, as set forth above, the preceding paragraph of this Agreement will be inoperative, both parties shall be free to recommend any sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw her plea of guilty because the government has failed to make a motion pursuant to Guideline § 5K1.1.

14. It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw her guilty plea.

15. Regarding restitution, defendant acknowledges that the total amount of restitution owed to victim is at least $1,500,000, minus any credit for funds repaid prior to sentencing, and that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant, together with any jointly liable co-defendants, to make full restitution in the amount outstanding at the time of sentencing.

16. Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), she is required to notify the Court and the

United States Attorney's Office of any material change in economic circumstances that might affect her ability to pay restitution.

17.     Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

18.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

19.     After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the forfeiture allegation as to defendant.

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

20.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 14 CR 732.

21.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States

14

Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

22.     Defendant understands that by pleading guilty she surrenders certain rights, including the following:

a.     **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against her, and if she does, she would have the right to a public and speedy trial.

i.     The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and her attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.     If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict her unless, after hearing all the evidence, it was persuaded of her guilt

15

beyond a reasonable doubt and that it was to consider each count of the third superseding indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and her attorney would be able to cross-examine them.

vi.     At a trial, defendant could present witnesses and other evidence in her own behalf. If the witnesses for defendant would not appear voluntarily, she could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.     At a trial, defendant would have a privilege against self-incrimination so that she could decline to testify, and no inference of guilt could be drawn from her refusal to testify. If defendant desired to do so, she could testify in her own behalf.

b.     **Waiver of appellate and collateral rights**. Defendant further understands she is waiving all appellate issues that might have been available if she had exercised her right to trial. Defendant is aware that Title 28, United States

Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal her conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant knowingly waives the right to appeal her conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Agreement. In addition, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant also waives her right to challenge her conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

23.     Defendant understands that by pleading guilty she is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to her, and the consequences of her waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

24.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against her, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

25.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of her financial circumstances, including her recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of her sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

26.     For the purpose of monitoring defendant's compliance with her obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's

18

Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

### Other Terms

27.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

28.     Defendant will not object to a motion brought by the United States Attorney's Office for the entry of an order authorizing disclosure of documents, testimony and related investigative materials which may constitute grand jury material, preliminary to or in connection with any judicial proceeding, pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i). In addition, defendant will not object to the government's solicitation of consent from third parties who provided records or other materials to the grand jury pursuant to grand jury subpoenas, to turn those materials over to the Civil Division of the United States Attorney's Office, or an appropriate federal or state agency (including but not limited to the Internal Revenue Service), for use in civil or administrative proceedings or investigations,

rather than returning them to the third parties for later summons or subpoena in connection with a civil or administrative proceeding involving, or investigation of, defendant. Nothing in this paragraph or the preceding paragraph precludes defendant from asserting any legal or factual defense to taxes, interest, and penalties that may be assessed by the IRS.

29.    Defendant recognizes that pleading guilty may have consequences with respect to her immigration status if she is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which defendant is pleading guilty. Indeed, because defendant is pleading guilty to an offense that is an "aggravated felony" as that term is defined in Title 8, United States Code, Section 1101(a)(43), removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including her attorney or the Court, can predict to a certainty the effect of her conviction on her immigration status. Defendant nevertheless affirms that she wants to plead guilty regardless of any immigration consequences that her guilty plea may entail, even if the consequence is her automatic removal from the United States.

## Conclusion

30.    Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

31.    Defendant understands that her compliance with each part of this Agreement extends throughout the period of her sentence, and failure to abide by

20

any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event she violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

32.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

33.     Defendant and her attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

34.     Defendant acknowledges that she has read this Agreement and carefully reviewed each provision with her attorney. Defendant further acknowledges that she understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _7 - 18 - 2016_

ZACHARY T. FARDON
United States Attorney

BROOKE HARPER
Trial Attorney

AVELINA FIEL
Defendant

STANDISH E. WILLIS
Attorney for Defendant

22