FILED

AUG 1 0 2016

JUDGE REBECCA R. PALLMEYER
UNITED STATES DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 14 CR 732 – 10 |
| v. | |
| JERILYN DEGUZMAN | Judge Rebecca R. Pallmeyer |

### PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, ZACHARY T. FARDON, and defendant JERILYN DEGUZMAN, and her attorney, MATTHEW MCQUAID, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure, as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charge in This Case

2.     The third superseding indictment in this case charges defendant with conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349 (Count 1).

3.     Defendant has read the charge against her contained in the third superseding indictment, and that charge has been fully explained to her by her attorney.

4.     Defendant fully understands the nature and elements of the crime with which she has been charged.

## Charge to Which Defendant Is Pleading Guilty

5.      By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the third superseding indictment, which charges defendant with conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349 (Count 1).

## Factual Basis

6.      Defendant will plead guilty because she is in fact guilty of the charge contained in Count 1 of the third superseding indictment. In pleading guilty, defendant admits the following facts and that those facts establish her guilt beyond a reasonable doubt:

From in or around April 2009 and continuing through in or around December 2011, at Cook County, in the Northern District of Illinois, JERILYN DEGUZMAN did conspire with Josephine Tinimbang, Monette Mojares, Sharon Gulla, Jose Calub, Marilou Lozano, and others known and unknown, to violate Title 18, United States Code, Section 1347, that is, knowingly and willfully to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

## The Home Health Care Companies

Josdan Home Health Care Inc. was a home health care company located in Lincolnwood, Illinois. Josdan purported to provide home health care services to beneficiaries insured by Medicare.

Medicare covered home health care services when beneficiaries were "homebound," or confined to the home. Home health care services were provided in 60-day periods of care, or "episodes." Medicare required a physician to certify each beneficiary as homebound in connection with every episode of care.

Medicare also required a registered nurse to complete a comprehensive health assessment, known as an OASIS assessment, for each beneficiary at the start of every episode of home health care. As part of the OASIS assessment, Medicare required the registered nurse to independently assess whether the beneficiary was homebound. The OASIS information was transmitted to Medicare, and Medicare used the information to determine how much to pay the home health care company for each episode of care. The sicker the patient appeared to be according to the OASIS assessment, the more Medicare paid for the episode of care.

The following individuals had the following roles during relevant periods:

- Josephine Tinimbang was an owner of Josdan.

- Richard Tinimbang was the Administrator of Josdan.

- Janet Guerrero was the Office Manager of Josdan.

- Monette Mojares was a registered nurse and the Director of Quality Assurance at Josdan.

3

- Sharon Gulla was a registered nurse who worked as the Director of Nursing and Assistant Director of Nursing at Josdan.

- Jose Calub was an in-house physician who worked at Josdan.

- Marilou Lozano was a registered nurse who worked as a start-of-care nurse at Josdan.

## The Conspiracy to Defraud

The defendant was a registered nurse licensed to practice nursing in the State of Illinois. In approximately the spring of 2009, defendant was interviewed by Richard Tinimbang and became a start-of-care nurse at Josdan. In that position, defendant regularly conducted OASIS assessments and provided follow-up nursing visits to patients in their homes. Then, in approximately the middle of 2011, defendant became a Quality Assurance nurse. In that position defendant reviewed OASIS forms completed by other nurses. Defendant worked as a Quality Assurance nurse for approximately six months.

Defendant understood the patients she assessed as a start-of-care nurse were insured by Medicare, and Medicare required the patients to be homebound and have a need for skilled care. Yet most of the beneficiaries defendant and others enrolled in home health care at Josdan were not homebound.

Shortly after defendant started working at Josdan, a supervising nurse named Monette Mojares gave defendant an orientation on completing OASIS forms. Mojares emphasized the importance of enrolling patients in home health care and told defendant that patients who appeared to be capable of taking care of themselves would not appear to be homebound and could not be enrolled. During the orientation,

4

Mojares encouraged defendant to complete the OASIS form in ways that made patients appear to be less capable of caring for themselves than they really were.

Near the beginning of her employment at Josdan, when defendant was assigned to enroll a new patient and saw that they were not homebound, defendant contacted Sharon Gulla to discuss the issue. More often than not, Gulla told defendant to enroll the patient in home health care anyway. In some cases, Gulla told defendant she had to admit the patient because the patient came from a source that was close to Josephine Tinimbang. In other cases, Gulla told defendant to admit the patient even though a doctor had not yet requested or approved the services. Defendant followed the instructions she received from Gulla, and falsified the patients' OASIS forms to make them appear to be qualified for the services. Defendant relied on the training she received from Mojares when she falsified the OASIS forms. Defendant estimates that more than half of the patients enrolled at Josdan were not really homebound.

After patients were enrolled in home health care at Josdan, defendant was sometimes assigned to provide the weekly "skilled nursing" visits to patients in their homes. When patients were not homebound and did not need home health care, the home visits often lasted no more than 15 to 20 minutes and included nothing more than checking the patient's vital signs and inquiring about their medications. The patients did not need these visits and they did not require the services of a skilled nurse.

In 2011, defendant became a supervising nurse. In her new role, defendant was responsible for reviewing other nurses' OASIS forms. Nurses sometimes turned OASIS

forms in to defendant, proposing to enroll patients in home health care who did not appear to be qualified for the care. Defendant returned these OASIS forms to the nurses who submitted them, expecting that the nurses would change the forms (to make patients appear to be qualified for home health care) and return them. One of the nurses to whom defendant returned OASIS forms in this way was Marilou Lozano. In general, when defendant returned forms to nurses, the nurses changed the forms (to make patients appear to qualify for the care) and returned them to defendant. Defendant returned forms most often to newer nurses, who were comparatively new to the process of falsifying forms so that patients could be enrolled.

More often than not, while defendant worked at Josdan, nurses visited patients and enrolled them in home health care before a doctor saw the patient to order care. After defendant became a supervising nurse, she noticed instances where nurses had already started visiting the patients and the patient's file did not include a doctor's order. When defendant encountered this issue, she brought it to the attention of Sharon Gulla, a more senior nurse. Gulla told defendant not to worry about the missing orders because the company could just send the patients to the in-house doctor, Dr. Calub, and he would order the services. Based on what defendant saw as a supervisor, Calub approved home health care for every patient he was asked to approve.

As a supervising nurse, defendant oversaw the care provided to a certain number of patients. As to that group of patients, defendant was responsible for implementing the company's practice of patient recycling. Under the practice, patients

6

were enrolled for a period of approximately six months, discharged for approximately 21 days, then re-enrolled for additional home health care. Patients who actually needed home health care were not subjected to the company's recycling practices, and defendant was aware that the recycled patients did not need home health care services. However, Josephine Tinimbang, one of the company's owners, closely monitored the patients who had been discharged and got upset if patients were not re-admitted after 21 days. When patients were not re-admitted in the way Josephine Tinimbang expected, she would call impromptu meetings and chastise the staff for failing to follow the recycling policy.

In sum, the defendant, Josephine Tinimbang, Monette Mojares, Sharon Gulla, Jose Calub, Marilou Lozano, and others agreed that Josdan would submit, and in fact caused Josdan to submit, fraudulent claims to Medicare for home health care services that beneficiaries did not qualify for or need. From approximately April 2009 to December 2011, defendant, the above-named individuals, and others caused Medicare to pay Josdan at least approximately $850,000 for fraudulent home health care claims.

7. The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crime and related conduct.

## Maximum Statutory Penalties

8. Defendant understands that the charge to which she is pleading guilty carries the following statutory penalties:

7

a.     A maximum sentence of 10 years' imprisonment. This offense also carries a maximum fine of $250,000. Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

b.     Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

c.     In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which she has pled guilty, in addition to any other penalty or restitution imposed.

## Sentencing Guidelines Calculations

9.     Defendant understands that in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

10.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.     **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2015 Guidelines Manual.

b.     **Offense Level Calculations**.

i.     The base offense level is 6, pursuant to Guideline § 2B1.1(a)(2).

ii.     The loss amount to Medicare is at least $550,000 but not more than $1,500,000. Therefore, pursuant to Guideline § 2B1.1(b)(1)(H), the base offense level is increased by 14 levels.

iii.     The defendant was a manager or supervisor and the criminal activity involved five or more participants. The offense level is therefore increased by 3 levels pursuant to Guideline § 3B1.1(b).

iv.     The defendant abused a position of trust with the Medicare program in a manner that significantly facilitated the commission or concealment of the offense. The offense level is therefore increased by 2 levels under Guideline § 3B1.3.

v.     Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for her criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if

9

defendant continues to accept responsibility for her actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to her ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

vi.      In accord with Guideline § 3E1.1(b), defendant has timely notified the government of her intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c.      **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

d.      **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level is 22, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 41 to 51 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

e.     Defendant and her attorney and the government acknowledge that the above guidelines calculations are preliminary in nature and based on facts known to the parties as of the time of this Agreement. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guidelines calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw her plea on the basis of the Court's rejection of these calculations.

f.     Defendant understands that the guidelines calculations set forth above are non-binding predictions, upon which neither party is entitled to rely, and are not governed by Fed. R. Crim. P. 11(c)(1)(B). Errors in applying or interpreting any of the sentencing guidelines (other than those identified above as binding) may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw her plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

## Cooperation

11.     Defendant agrees she will fully and truthfully cooperate in any matter in which she is called upon to cooperate by a representative of the United States

11

Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding. Defendant agrees to the postponement of her sentencing until after the conclusion of her cooperation.

### Agreements Relating to Sentencing

12.    At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this Agreement, then the government shall move the Court, pursuant to Guideline § 5K1.1, to depart downward from the low end of the applicable guideline range, and shall recommend a sentence that includes a term of imprisonment in the custody of the Bureau of Prisons of 66 percent of the low end of the applicable guideline range. Defendant shall be free to recommend any sentence. Defendant understands that the decision to depart from the applicable guideline range rests solely with the Court.

13.    If the government does not move the Court, pursuant to Guideline § 5K1.1, to depart from the applicable guideline range, as set forth above, the preceding paragraph of this Agreement will be inoperative, both parties shall be free to recommend any sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to § 5K1.1.

Defendant may not withdraw her plea of guilty because the government has failed to make a motion pursuant to Guideline § 5K1.1.

14.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw her guilty plea.

15.     Regarding restitution, defendant acknowledges that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant, together with any jointly liable co-defendants, to make full restitution to the Medicare program in the amount of at least $850,000, which amount shall reflect credit for any funds repaid prior to sentencing.

16.     Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), she is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect her ability to pay restitution.

17.     Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

18.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

19.     After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the second superseding indictment and the forfeiture allegation as to defendant.

### Acknowledgments and Waivers Regarding Plea of Guilty

#### Nature of Agreement

20.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 14 CR 732.

21.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

#### Waiver of Rights

22.     Defendant understands that by pleading guilty she surrenders certain rights, including the following:

14

a. **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charge against her, and if she does, she would have the right to a public and speedy trial.

i. The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and her attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict her unless, after hearing all the evidence, it was persuaded of her guilt beyond a reasonable doubt. The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

iv. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

      v.      At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and her attorney would be able to cross-examine them.

      vi.      At a trial, defendant could present witnesses and other evidence in her own behalf. If the witnesses for defendant would not appear voluntarily, she could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

      vii.      At a trial, defendant would have a privilege against self-incrimination so that she could decline to testify, and no inference of guilt could be drawn from her refusal to testify. If defendant desired to do so, she could testify in her own behalf.

      b.      **Waiver of appellate and collateral rights**. Defendant further understands she is waiving all appellate issues that might have been available if she had exercised her right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal her conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant knowingly waives the right to appeal her conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, in

16

exchange for the concessions made by the United States in this Agreement. In addition, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant also waives her right to challenge her conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

23.     Defendant understands that by pleading guilty she is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to her, and the consequences of her waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

24.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charge against her, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

17

25.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of her financial circumstances, including her recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of her sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

26.     For the purpose of monitoring defendant's compliance with her obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

27.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

28.     Defendant recognizes that pleading guilty may have consequences with respect to her immigration status if she is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which defendant is pleading guilty. Indeed, because defendant is pleading guilty to an offense that is an "aggravated felony" as that term is defined in Title 8, United States Code, Section 1101(a)(43), removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including her attorney or the Court, can predict to a certainty the effect of her conviction on her immigration status. Defendant nevertheless affirms that she wants to plead guilty regardless of any immigration consequences that her guilty plea may entail, even if the consequence is her automatic removal from the United States.

## Conclusion

29.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

30.     Defendant understands that her compliance with each part of this Agreement extends throughout the period of her sentence, and failure to abide by any

term of the Agreement is a violation of the Agreement. Defendant further understands that in the event she violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

31. Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

32. Defendant and her attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

33. Defendant acknowledges that she has read this Agreement and carefully reviewed each provision with her attorney. Defendant further acknowledges that she understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _____8 | 10 | 2016_____

_____
ZACHARY T. FARDON
United States Attorney

_____
BROOKE HARPER
Trial Attorney

_____
JERILYN DEGUZMAN
Defendant

_____
MATTHEW MCQUAID
Attorney for Defendant

21